# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville August 21, 2013

## STATE OF TENNESSEE v. WILLIAM ALBERT KELLY

**Appeal from the Criminal Court for Sumner County**
**No. 521-2010     Dee David Gay, Judge**

---

**No. M2012-02404-CCA-R3-CD   Filed October 16, 2013**

---

The Defendant, William Albert Kelly, appeals the Sumner County Criminal Court's order revoking his probation for perjury and attempted failure to report as a sex offender and ordering his effective two-year, eleven-month, and twenty-nine-day sentence into execution. The Defendant contends that the trial court (1) abused its discretion by revoking his probation and (2) illegally recommended that he not be eligible for release after serving thirty percent of his sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Heather Haufler, Hendersonville, Tennessee, for the appellant, William Albert Kelly.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; L. Ray Whitley, District Attorney General; and C. Ronald Blanton and Bryna Landers Grant, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On November 4, 2010, the Defendant pleaded guilty to perjury and attempted failure to report as a sex offender and was sentenced to two years, eleven months, twenty-nine days' probation. On November 7, 2011, the Defendant pleaded guilty to violating the terms of his probation, and the trial court revoked the Defendant's probation, sentenced him to time served, and returned him to probation.

On May 1, 2012, a probation violation warrant was filed, alleging that the Defendant was arrested for domestic assault against his wife in Wilson County and that he engaged in

assaultive, abusive, threatening, or intimidating behavior. An amended probation violation warrant was filed on July 23, 2012, alleging that the Defendant sent his wife a threatening letter. The Defendant's release had been conditioned upon his agreeing not to contact his wife. These probation violation warrants are the subject of this appeal.

At the revocation hearing, Wilson County Probation Officer David Stanfield testified that he supervised the Defendant's probation. He said that the Defendant reported once a month, that he paid his court costs, and that he had never failed a drug screen. He said that although the domestic assault charge prompted the initial revocation warrant, the charge was dismissed. He said the probation revocation warrant was amended after he received a telephone call from the Defendant's wife, who told him that she received a threatening letter from the Defendant. He said that as a condition of his probation, the Defendant was prohibited from engaging in assaultive, abusive, threatening, or intimidating behavior.

On cross-examination, Mr. Stanfield testified that he talked to Ms. Kelly and read the affidavit she submitted after the Defendant was arrested for domestic assault. He said he also spoke with Ms. Kelly's friend, who discussed Ms. Kelly's fear of the Defendant and the conduct leading to the Defendant's arrest. He said that he reviewed the handwritten letter Ms. Kelly received and compared the handwriting in the letter to the probation forms completed by the Defendant. He agreed the Wilson County Court found insufficient evidence to conclude the letter was written by the Defendant. He denied the Defendant admitted to the domestic assault. He said, though, that the Defendant admitted arguing with Ms. Kelly.

Sherri Kelly, the Defendant's wife, testified that she had known the Defendant for six years and that she obtained a domestic assault warrant against him on May 1, 2012. She said that before the bench trial on the domestic assault charge, she received a letter from the Defendant. She said that she was familiar with the Defendant's handwriting and that the letter contained the Defendant's handwriting. She said the return address was the Sumner County Jail. The letter stated,

> Hello,
> Do you remember . . . when you did the insurance scam[?] [I]t was your house . . . and your police report and you cashed the check. [T]hat is a[n] E Felony. [T]hat is 3 to 5 years. I will tell a f------ detective. [There] are a bunch of them right around the corner from my m-----f------ cell[.] I will tell them about all the s--- you turn in stolen from your house. [I]t was not my house. If you think you can get away with [it,] you are so f------ dumb. [T]hey will cuff you in the middle of your shift at Wal-Greens [sic]. [Y]ou will not like it in here[.] So do yourself a favor drop the charges on me or else I will

tell them all about your scam. . . . [T]hey love to here [sic] about stuff like that. You did it all by yourself. Not me[.] It was all in your name[.] [T]he police report you signed[.] [Y]ou signed the check. So I will go away just do the thing you need to do or show this letter to the judge so they can arrest you[.] I will testified [sic]. [Y]ou think you are to[o] good to do time[.] [T]hey don't give a f------ s--- about you[.] I'm not playing anymore. [C]all the lawyer I had the first time . . . or you will lose your f------ job and freedom. So you will be better off or I will do what ever [sic] it takes to have you in jail like me[.] [Y]ou can't take a charge[.] [Y]ou can't make it in here[.] I will be more than happy to tell on your . . . dumb a--[.] I am pissed off like you will never believe so if you don't want to go to jail get me the f--- out of here or maybe your f------ Mom can help[.] Ha Ha. I know you took my money I had saved to[o]. . . . [G]o see the B----[.] I can't tell you how bad it will be for you not to believe me. [Mr. Patrick] is in the cell here and a lawyer is on the top bunk or bed. [Y]ou might think you might get out of it[,] but do you real[l]y want to try. Just drop the charges and I will go away from you and your little . . . friend.

I am not f------ playing B----[.] Jail is no f------ fun for a girl so don't try me[.]

Don't take your time[.] I am pissed.

Ms. Kelly said that she met the Defendant's cellmate, William Patrick, and that he had no reason to be upset with her. She denied other inmates at the Sumner County Jail were angry with her. She agreed the letter contained details about her life.

Ms. Kelly testified that on May 1, 2012, the Defendant received a telephone call from his nephew, Brian, who wanted his truck returned and wanted the Defendant to pay a debt. The Defendant told Brian that he would return the truck as soon as possible. The Defendant told Brian that "there's a few things missing," and Brian said, "[T]here's nothing missing. . . . [I]f you lie to me about anything, I'll know about it, because Sherri will tell me the truth because she always tells me the truth." She said the Defendant called her a "f------ b----" and asked how she could tell his nephew anything. She told the Defendant that his nephew needed to know the Defendant was lying about meeting his probation officer daily. She said the Defendant worked for his nephew. She said she left, and the Defendant called to find her. She said that her wallet was missing when she returned and that she left for the bank to cancel her bank cards. She said that after she left, the Defendant called asking where she was going. After she told him she was going to the bank, the Defendant said she had fifteen minutes to return or "face the consequences." She said she returned home without going to

the bank but stayed inside her truck. She said the Defendant periodically came outside their home, called her names, and entered their home. She said that on one occasion, the Defendant came to the truck and pulled her wallet from under her seat. She denied placing it there.

Ms. Kelly testified that the Defendant left, that she went inside to gather her belongings and her cat, and that the Defendant returned and yelled at her. She said she ignored him, which angered him, and he grabbed her by the throat, pushed her against the couch, and spit in her face. She asked if she could leave, and the Defendant denied her request. She asked why he would not allow her to leave, and the Defendant said he wanted her to die and to watch her suffer. She said that she attempted to gather her belongings and leave when the Defendant went to bed but that he came out of the bedroom, took her truck keys and cell phone, and refused to return them. She said she took her spare truck key from the Defendant's pants pocket and left. She said that the Defendant followed her in his car, that she drove to Walgreens where she worked, and that she asked someone for help. She called the police, and the officer requested she come to the station to complete a report. She said that while she was inside Walgreens, the Defendant parked his car in the parking lot, entered her truck, and drove away. She said a co-worker drove her to the police station. She said she was afraid for her life. She said she received the letter about three weeks later.

On cross-examination, Ms. Kelly testified that she did not have any visible injuries after the attack. She said that although the Defendant had heart surgery a few years previously, he was stronger than she. She agreed the Defendant received disability benefits because of his heart condition and diabetes. She denied witnesses to the attack existed.

Ms. Kelly testified that she did not have a sample of the Defendant's handwriting but that she had seen his handwriting numerous times. She said that the threatening letter contained information about her previous address, her mother, and a burglary at their home and that only the Defendant could have known the information. She said it was unlikely the Defendant discussed these topics with other inmates. She agreed she received two letters from Mr. Patrick. She agreed she filed for divorce and said she planned to ask for the truck and their "camper." She agreed that it would have been difficult for the Defendant to maintain the truck and the camper if he were incarcerated.

On redirect examination, Ms. Kelly testified that the letters she received from Mr. Patrick contained handwriting that was different from the threatening letter she received from the Defendant. She said those letters were not threatening. On recross-examination, She identified the envelope from the threatening letter she received. She agreed that the 3 and the 7 in the zip code were unique but said that the handwriting on the envelope did not match the handwriting in the letter. She believed Mr. Patrick addressed the envelope that contained

the threatening letter written by the Defendant. She agreed the threatening letter and the letters she received from Mr. Patrick each began with "hello" but denied the "H" was similar. She denied another inmate wrote the threatening letter.

Upon examination by the trial court, Ms. Kelly testified that the Defendant was previously convicted of sexual battery in 1998. She did not know him at that time. She said this conviction required him to register as a sex offender.

The Defendant testified that Ms. Kelly provided testimony at the Wilson County bench trial similar to the testimony she gave at the revocation hearing. He denied assaulting her. He said his son testified at the trial that the Defendant did not write Ms. Kelly a letter. He said that although he had never abused Ms. Kelly, she had abused him. He said that on one occasion, they argued about money and that she "just lost it" and assaulted him. He believed Ms. Kelly falsely accused him of assault because she wanted a "cheap, quick, take-everything divorce." He said that three weeks after his arrest, Ms. Kelly had a boyfriend, hid the camper, and denied his son access to obtain the Defendant's clothes. He said he paid $5000 from his Social Security benefits for the camper. He said he bought the truck after he met Ms. Kelly.

The Defendant testified that he did not write the threatening letter and said that he did not know how to write in cursive. He said he wrote his last letter when he was in the Army in 1970. He said that he disliked writing because it was time consuming and that Ms. Kelly completed his truck-driving logbooks.

On cross-examination, the Defendant testified that on May 1, 2012, he and Ms. Kelly argued but that he did not follow her to Walgreens or spit in her face. He agreed his heart surgery was two years previously. He said he only used cursive writing to sign his name. He agreed, though, that he used cursive writing when he completed the probation forms. He believed that Ms. Kelly wrote or had someone write the threatening letter and that she used an envelope that came from the jail previously. He agreed he was previously convicted of three counts of sexual battery in 1998.

Joey Kelly, the Defendant's son, testified that at the Wilson County trial, he was presented with the threatening letter and that he could not identify the writing as the Defendant's. He said the Defendant did not write. He said that before the Defendant was accused of assault, the Defendant and Ms. Kelly were happy. He said Ms. Kelly told him that she was happy and that it had been a long time since she was last happy. He denied seeing evidence that Ms. Kelly was abused. He denied the Defendant abused him or anyone else. He said that his parents divorced when he was young and that they were friendly.

On cross-examination, Mr. Kelly testified that he did not know the Defendant was arrested for aggravated domestic assault in 2002. He agreed he could not identify the handwriting in the threatening letter as the Defendant's because he had not seen the Defendant's handwriting.

Courtney Gregory, the Defendant's daughter, testified that the Defendant and Ms. Kelly had a happy relationship and that she saw no evidence of marital problems or abuse. She denied the Defendant's abusing her or her mother.

The trial court credited Ms. Kelly's testimony and found by a preponderance of the evidence that the Defendant assaulted Ms. Kelly and wrote the threatening letter. In discrediting the Defendant's testimony, the court noted the Defendant's five felony convictions, including his perjury conviction. The court compared the handwritten letter to the probation forms completed by the Defendant and found that the Defendant wrote the letter. The court found that the Defendant violated the conditions of his probation, revoked his probation, and ordered his sentence into execution. The court further stated, "I want you to put specifically in [the order] that the Criminal Court Judge recommends that he not be released at 30 percent. The Criminal Court Judge of Sumner County recommends to the parole [board] that he flatten any sentence that he serves." This appeal followed.

# I

The Defendant contends that the trial court abused its discretion by revoking his probation. He argues that the record fails to show substantial evidence supporting a finding that he committed domestic assault. The State responds that the court properly revoked the Defendant's probation. We agree with the State.

A trial court may revoke probation upon its finding by a preponderance of the evidence that a violation of the conditions of probation has occurred. T.C.A. § 40-35-311(e) (2010). "In probation revocation hearings, the credibility of witnesses is to be determined by the trial judge." *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991) (citing *Carver v. State*, 570 S.W.2d 872 (Tenn. Crim. App. 1978)). If a trial court revokes a defendant's probation, its options include ordering confinement, ordering the sentence into execution as originally entered, returning the defendant to probation on modified conditions as appropriate, or extending the defendant's period of probation by up to two years. T.C.A. §§ 40-35-308(a), (c), -310 (2010); *see State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999). The judgment of the trial court in a revocation proceeding will not be disturbed on appeal unless there has been an abuse of discretion. *See State v. Williamson*, 619 S.W.2d 145, 146 (Tenn. Crim. App. 1981). In order for this court to find an abuse of discretion, "there must be no substantial evidence to support the conclusion of the trial court that a violation of the

conditions of probation has occurred." *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001).

We conclude that the record contains sufficient evidence showing the Defendant violated the conditions of his probation. The trial court credited Ms. Kelly's testimony. The Defendant became angry with Ms. Kelly, grabbed her by the throat, pushed her against the couch, spit in her face, told her he wanted her to die and to watch her suffer, and prevented her from leaving their home. After she was able to leave, the Defendant followed her to work. As a condition of his probation, the Defendant was prohibited from engaging in assaultive, abusive, threatening, or intimidating behavior. Although the Defendant argues that the Wilson County Court's finding him not guilty beyond a reasonable doubt of domestic assault after a bench trial prevents a finding that he violated the conditions of his probation, the standard of proof in a probation revocation hearing is merely by a preponderance of the evidence. *See State v. Delp*, 614 S.W.2d 395, 397 (Tenn. Crim. App. 1980); *see also Ray v. State*, 576 S.W.2d 598, 600 (Tenn. Crim. App. 1978). The court was not bound by the Wilson County Court's findings.

Regarding the threatening letter, Ms. Kelly was familiar with the Defendant's handwriting and had seen his writing numerous times over the course of their relationship. She concluded that the Defendant wrote the letter, and the trial court credited her testimony. The record contains the letter and the probation forms completed by the Defendant. This is sufficient evidence justifying the probation revocation. We note that although the Defendant testified that he did not use cursive writing, the probation forms contain cursive writing. The record reflects that the trial court properly found that the Defendant violated his probation and that it exercised proper discretion in revoking his probation and ordering his sentence into execution.

## II

The Defendant contends that the trial court illegally recommended that the Defendant not be eligible for release after serving thirty percent of his sentence. He argues that the court did not have the authority to "deny or interfere with" his determinate release and that its recommendation illegally increased his sentence. The State responds that the trial court merely made a recommendation and did not impose an illegal sentence. We agree with the State.

The trial court recommended to the Board of Probation and Parole that the Defendant not be released after serving thirty percent of his sentence. This court has stated that "a 'recommendation' is that and nothing more." *Durroccus D. Harris v. State*, No. M1999-02171-CCA-R3-PC, slip op. at 2 (Tenn. Crim. App. June 30, 2000) (concluding that a trial court's recommendation that the petitioner be admitted to the Department of Correction's

boot camp program did not require the Department to admit him to the program).  The Board of Probation and Parole decides whether to grant or deny a defendant's request for release after becoming eligible, not a trial court.  *See* T.C.A. § 40-28-118(a) (2012).  The Defendant is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE